HAROLD ST. JOHN v. THE STATE.

No. 3575. Decided June 23, 1915.

**Aggravated Assault—Insufficiency of the Evidence.**

Where, upon trial of aggravated assault upon a little girl, charging indecent fondling her person, the evidence did not sustain the conviction (although it was immaterial whether the child consented), the judgment is reversed and the cause remanded. Prendergast, Presiding Judge, dissenting. Citing Scroggins v. State, 51 S. W. Rep., 232.

Appeal from the County Court at Law of Harris. Tried below before the Hon. Clark C. Wren.

Appeal from a conviction of aggravated assault; penalty, one year imprisonment in the county jail.

The opinion states the case.

*E. R. Campbell*, for appellant.—Cited Branch on Criminal Law, p. 34, sec. 74.

*C. C. McDonald*, Assistant Attorney General, *E. T. Branch*, and *John H. Crooker*, District Attorney, for the State.—Cited Scroggins v. State, 51 S. W. Rep., 232; Rogers v. State, 40 Texas Crim. Rep., 355; Hill v. State, 37 id., 279.

HARPER, JUDGE.—Appellant was convicted of making an aggravated

assault on a little girl, and his punishment assessed at one year imprisonment in the county jail.

We agree with State's counsel in the contention that it is immaterial whether or not appellant had the girl's consent, she being only nine years of age. Being of that tender age, even if he had her consent, it would not authorize him to fondle her person in an indecent manner, and the cases of Knight v. State, 48 Texas Crim. Rep., 41; Rogers v. State, 40 Texas Crim. Rep., 355; Hill v. State, 37 Texas Crim. Rep., 279, and Scroggins v. State, 51 S. W. Rep., 232, correctly so announce the law. But the issue in this case is, does the evidence show that appellant was guilty of indecently fondling the person of little Myrtle Ferguson? The note he wrote and handed to the little girl was an improper one, but in and of itself would not constitute an assault of any character. It may and should be read and considered in passing on the acts of appellant, and if viewed in the light of this letter, his acts amounted to an indecent fondling of her person, the case should be affirmed. The strongest evidence offered in behalf of the State is that of Officer Wilkins, who testifies that the father of Myrtle showed him the letter or note, and asked that he watch them when they went to the moving picture show that afternoon. Mr. Wilkins testifies: "I went down in front of the Texas Theater on Main Street, and when Myrtle Ferguson and her sister entered the theater I followed them, and procured a seat just behind them. Shortly afterwards the defendant came in. He could not get a seat with these girls at first and had to wait a little bit until a seat was made vacant. He then secured a seat next to the smallest girl and sat with her during the rest of the show. He would lean over close to this little girl and had his hand in her lap. He would lean over on her shoulder and put his face down close to hers. He would lean over close to her when talking to her. She had on a long rain coat and his hand was slipped in between the folds of the rain coat in front. I followed them out after the show, arrested him and took him down to the station."

This is the State's case if it has one. Myrtle Ferguson testified that she and her sister Mabel were carried to the picture show by their father, he knowing that appellant would go with them to the show. She testified: "On February 13, 1915, which was on Saturday, the defendant and my small sister, who is eleven years old, and myself saw a moving picture show together on Main Street, at the Texas Theater. My sister and I went into the picture show first and left him (appellant) talking to my father out in front. Mr. St. John came in after we were seated and he could not get a seat with us. He sat across the aisle until a seat was made vacant near us and then I called his attention to it and he came over and sat with us. He sat on my left in the adjoining seat to mine, and my sister Mabel sat on my right, in the adjoining seat, and we saw the picture together. The lights in the show were dimmed. There were lots of people sitting in front of us and behind us, and during the show he had his hand in my lap resting on my knee, and let his hand rest in my lap and held my hand. He had

held me in his lap and had had his arm around me in that way, and held my hand in his a number of times before. He did not mean any harm and I did not think it was wrong."

Her eleven-year-old sister Mabel testifies in substance to the same thing, and says she and her sister often went to a moving picture show managed by appellant; that she had "often seen Mr. St. John hold Myrtle on his lap with one arm around her like a man holds a child on his lap. He never did seem to try to conceal or keep people from seeing that he was making over Myrtle and petting her and playing with her and holding her on his lap. He did it right out before everybody and before me, and before his wife and his wife's family, and where everybody in the moving picture show, or buying tickets, would see him. Myrtle never said anything to me about the defendant's treatment of her. Mamma and papa knew that we were over there at the picture show all the time. I did not think there was anything wrong in his treating Myrtle in that way, and I never did object to it or say anything about it either to Myrtle or my mother or to Mr. St. John or any of his people, and Mrs. St. John or her people never did say anything about it being wrong, and Myrtle never did say anything about it to me which showed that she thought anything about it other than as a child. I never did see Mr. St. John act with Myrtle in any way that was naughty, and never did hear him say anything naughty to her, and Myrtle never did tell me that he had ever said or done anything naughty to or with her."

All the testimony shows that appellant and his wife were neighbors of Mr. Ferguson. That Mr. Ferguson's little girls often went to a picture show run by appellant, who admitted them free. That little Myrtle was a favorite of appellant and he made much of her in the presence of his wife and in the presence of others. She was often in his lap, he playing with her as one would with a child. He says: "I have known Myrtle Ferguson since we first began to run the moving picture show. Her home was about three or four doors from the moving picture show. She and her sister Mabel were over at and around the show almost every evening, and were around my wife and myself whenever they were over there. I became very fond of Myrtle, as did also my wife, and she seems to be very fond of us. I am very fond of children, and Myrtle has an affectionate disposition, and is very lovable. My wife was generally with me around the show, and her father was always there, being usually in the operating room, and her mother and sister were frequently over there. Myrtle's sister Mabel always came over to the show with Myrtle. They both of them went in and out of the show whenever they pleased."

Appellant does not deny laying his hand in the lap of the little girl on the occasion charged, but the evidence, under the peculiar circumstances of this case, we do not think shows an indecent fondling of her person.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE (dissenting).—In Judge Harper's opinion herein he does not give, nor purport to give, all of the testimony. In my opinion, outside of Officer Wilkins' testimony, Judge Harper calls attention to the exculpatory and not to the inculpatory testimony herein.

The sole question in this case is whether or not the testimony and the inference the trial judge was authorized to draw therefrom was sufficient to show that appellant committed an assault upon this little girl. This court, in reviewing that question, must, under the law, look to the inculpatory evidence especially, and if from that the judgment could be sustained, it is the duty of this court to sustain it.

The testimony is too lengthy to undertake to state it all. I will state, however, the salient features of it.

The uncontradicted testimony by all the witnesses showed that appellant, in connection with his father-in-law, operated a picture show four doors distant from the home of said little girl, Myrtle Ferguson, and her parents. Appellant's wife, his father-in-law and mother-in-law and his wife's sister all helped to run said picture show. The two little girls, Myrtle and Mabel, were in the habit of daily attending said picture show in the evening. This continued for several weeks. During this time appellant began to fondle and caress and have in his lap this little girl, but a remarkable thing about all this is that it was always done in the presence of appellant's wife and the other members of his family. They all practically so swore and he expressly did so, saying: "When I would pet her (Myrtle) and play with her and hold her on my knee in the manner about which I have testified, *my wife was always present,* and Myrtle's sister was always present, and frequently my wife's mother and sister and her father were around." His wife swore: "Whenever he would be noticing her (Myrtle) or petting her, or holding her in his lap, or playing with her, *it would be right before everybody. Her sister Mabel would be there and I and the other members of my family would be around.*" No one disputes this. It is also further shown, without controversy, that when he was thus fondling this little girl that they each occasionally wrote the other what they said were play notes, but they were always, like his other actions with this child, written and delivered in the presence of his wife and all the others, as stated above. As Myrtle testified: "He and I had written play notes to each other and at the picture show before the time that he gave me this letter (hereinafter copied); they were just little play notes, and I would write them to him and he would write them to me on pieces of paper *while we would be right there together, but no such note as this.* He never did call me darling or sweetheart in any of those play notes. I can't remember now what was in them."

From the whole of the testimony which I have carefully studied, no other conclusion can be drawn therefrom than that this little girl became enamored and infatuated—completely so, of appellant, and his said fondling and caressing her aroused and inflamed his lustful passions for this little girl. Let's see what followed. His picture show

gct out of repair in some way and had to be stopped and shut down on that account, and it was thus stopped and shut down for some length of time. During the time it was thus closed he did not see and come in contact with this little girl. So he thus wrote to her:

"My Own Darling Myrtle. I trust you will not be angry at me for writing this little note to you. Please do not show this to anyone. I wonder if you have been missing being with me as I have missed being with you? I hope you have not, for I sure have suffered and I hope you have not suffered as much as I have. There has been a number of nights that I could not sleep because I was thinking of my sweetheart. I wonder if you have been thinking any of me or if you have forgotten all about me? I suppose it will not be long until you will have forgotten that you ever knew such a person as I. I have loved you from the first time that I saw you and I always will love you. Perhaps in years to come you may love me. I hope so, but before that time comes I am afraid you will have forgotten all about me. I will look for you uptown Saturday between one and two P. M. With love and kisses."

It is unsigned. No one could know from it that he wrote it. He intended it so. The little girl, Myrtle, testified: "I had not seen Mr. St. John for several days before this Saturday. They had closed down the moving picture show near our house, in which he was working, for repairs, several days before, and he had not been there for several days. I saw him over in town on Thursday, February 11th, and he handed me the letter which you have shown me. I was with my sister and another girl at the time. They were a little in front of us, but my sister turned and saw him hand the letter to me. I don't think he tried to keep anyone from seeing him give the letter to me. My sister asked me to let her see the letter but I would not do it."

Let's see what Myrtle's sister Mabel testified on this subject. She said: "I was with Myrtle when Mr. St. John gave her this note (referring to the letter above copied). Myrtle and I and another little girl were together on the street. He came up to us and was talking to us and we walked along the street together. *I was not facing them at the time, but was in front of them, and I turned around and saw him hand her the letter. I don't know whether he knew I saw him hand her the letter or not,* but he didn't try to conceal it. She would not let me read the letter after she got it. That night when we got home I told mamma about Myrtle getting the letter from Mr. St. John, and mamma made Myrtle give her the letter."

Let's see what appellant testified on this subject. He said: "I wrote this letter to Myrtle, which you hand me (referring to the letter above copied) and I gave it to her myself on Thursday before I was arrested. I handed it to her in the presence of her sister Mabel and another little girl. *They were walking ahead of us and their backs were turned when I handed Myrtle the note. I did not know that they saw me give it to her.*"

Read the letter again. Then ponder it. Ponder each sentence of it.

He was a young man, twenty-four years old; he was a married man. Mark the last sentence, "I will look for you uptown Saturday between one and two P. M." She met the engagement. She found him—he found her. What did Mabel say? She said: "She (Myrtle) would not let me read the letter after she got it. That night when we got home I told mamma about Myrtle getting the letter from Mr. St. John and mamma made Myrtle give her the letter." Myrtle said: "My sister told my mother about the letter and that I would not show it to her, and mamma made me show it to her."

Myrtle's father and mother that night consulted about this letter and appellant's conduct towards the child. They thereupon placed the affair in the hands of the officers. The police officer detailed Officer Wilkins to go to the theater and watch appellant's conduct towards this child when she would meet him there, for him to take her to one of the moving picture shows. Her father took the two little girls around in his automobile. He was a jitney man and drove up in front of this theater, found appellant there watching for his victim. This was the first time Myrtle's father had ever seen appellant. Her father and mother neither had ever seen him before. It appears that the officer whom the child's father had had detailed was not in sight. He didn't then turn over his child to appellant, but instead, delaying, took her one or two rounds with him and then brought her back. Seeing the officer there he then turned her over to appellant. The father detained him in conversation a while. The girl went in the theater and procured a seat. The officer seated himself just behind them to watch and did watch. A little later appellant went into the show. He couldn't at first get a seat beside the little girl. He sat elsewhere, he watching her, too. Soon the seat beside her was vacated and appellant immediately took it. Then what did he do? Officer Wilkins says: *"He would lean over close to this little girl and had his hand in her lap. He would lean over on her shoulder and put his face down close to hers. He would lean over close to her when talking to her. She had on a long rain coat and his hand was slipped in between the folds of the rain coat in front."* Appellant himself denied that he slipped his hand in between the folds of the coat, but said, "At times during the show *my hand lay over in her lap and on her knee. . . .* I did not have my hand underneath the folds of her rain coat but it lay only across her lap and I did not lean over on her when talking to her." The officer who was detailed for the specific purpose of watching him did so and testified positively, as shown above, that he did place his hand underneath the folds of her rain coat and that he did lean over on her when talking to her. The testimony of all the witnesses shows the lights in the show were dimmed. Everyone knows how that is. Myrtle said: "During the show *he had his hand in my lap resting on my knee and let his hand rest in my lap and held my hand.*" Mabel, on this point, testified: *"Mr. St. John had his hand in Myrtle's lap while the picture show was going on and was holding her hand. We all three*

talked about the pictures *but I did not pay any attention to them because I was looking at the pictures.*"

He contended and testified, that he had no improper motive whatever. Of course he would so testify. The judge who saw him and heard him and saw and heard all the other witnesses, did not believe him when he so testified. Said letter and his actions spoke louder than his sworn testimony when he was seeking to avoid punishment for his crime

The statement of facts does not distinguish between what is drawn out on direct and what on cross-examination. Evidently what I will now quote was his testimony on cross-examination, when asked about the letter he had surreptitiously attempted to slip and did, to this child. He said: "I don't know why I started it 'My own darling Myrtle,' except that it was just like I would have spoken to my own child. I had never addressed her that way in a letter before. I don't know why I told her 'I trust you will not be angry with me for writing this little note to you.' I can't say why I thought she might be angry. I put in this note, 'Please do not show this to anyone,' because I didn't want anyone to find out that I had written a note and 'kid' me about it. I wrote in this letter, 'I wonder if you have been missing being with me as I have missed being with you,' because we had not seen each other for several days, and I had, of course, missed seeing her, as I was very fond of her. I don't know why I put in this letter, 'I hope you have not suffered as much as I have.' I had not suffered on account of not seeing her. When I wrote in the letter, 'There has been a number of nights that I could not sleep because I was thinking of my sweetheart,' I don't know now whether I was referring to Myrtle or not. I sometimes called my wife 'sweetheart.' It is a fact that I did not lay awake nights unable to sleep because I was thinking of my wife, and neither did I lay awake nights unable to sleep because I was thinking of Myrtle. When I said, 'There has been a number of nights that I could not sleep because I was thinking of my sweetheart,' I might have been speaking of my wife. I can't say why I put in this letter, 'I have loved you from the first time that I saw you, and I always will love you, perhaps in years to come you may love me,' except that I have always been very fond of the child and wanted her to always love me and think well of me in the future. I did not expect to follow this child up in years to come, except as a friend. I closed the letter with the words, 'With love and kisses,' but that is the first time I ever said anything to her about kisses and love. I had never kissed her in my life. I had never written a note like this one to her before. Don't know why I closed it the way I did. I did not sign the letter. It was not necessary because I expected to hand it to her in person."

In order for appellant to commit an aggravated assault upon this child it was not necessary for him to have placed or attempted to place his hand upon her privates. The laying of his hand in her lap, slipped in between the folds of her rain coat, and his holding her hand in his and leaning over on her shoulder and putting his face down close to hers, was such assault under the circumstances, as shown without ques-

tion by this record. It may have been done with the consent of this child. She knew no better. He did. This violence to her person, she being of such tender years, was an aggravated assault under our law. If the child had been old enough to understand there can be no question but that his conduct would have created in her "a sense of shame or other disagreeable emotion of the mind." (P. C., art. 1009.) And as said by this court in Hill v. State, 37 Texas Crim. Rep., 279, quoted and approved in Rogers v. State, 40 Texas Crim. Rep., 357, and the other two cases cited by Judge Harper, such an act "committed upon a child of such tender years is a crime whether with or without her consent. Legally she has no will to resist or consent. There may be an actual submission of a child without constituting legal consent." I think the case of Scroggins v. State, 51 S. W. Rep., 232, is not so strong as this case and this court affirmed that case.

To my mind, the evidence in this case, the whole of it, not only authorized the trial judge to find, as he did, that the acts and conduct of the appellant towards this child showed an aggravated assault upon her, but required him to so find. I think the judgment should be affirmed and not reversed.